Court Of Appeals
Fourth Court of Appeals District of Texas
San Antonio



# MEMORANDUM OPINION

No. 04-08-00750-CR

Florentino **GARCIA**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 381st Judicial District Court, Starr County, Texas
Trial Court No. 06-CR-15
Honorable Jose Luis Garza, Judge Presiding

Opinion by:  Phylis J. Speedlin, Justice

Sitting:  Catherine Stone, Chief Justice
Phylis J. Speedlin, Justice
Steven C. Hilbig, Justice

Delivered and Filed: December 23, 2009

REVERSED AND REMANDED

Garcia appeals his conviction for aggravated sexual assault, asserting, among other issues,

that his trial counsel rendered ineffective assistance. Because we conclude that Garcia was deprived

of a fair trial by the totality of his attorney's representation, we reverse the judgment of the trial court

and remand the cause for a new trial.

## FACTUAL AND PROCEDURAL BACKGROUND

At her birthday party, Dora Lydia Sepulveda, a 53 year-old mentally and physically disabled woman, told a relative that one of her uncles, Florentino Garcia, sexually assaulted her about a week before her birthday, on or about January 7, 2006. She stated that while she was at a relative's house waiting for them to arrive so she could help plant a palm tree, Garcia, who lived next door and who was "heavily drunk," came up behind her and grabbed her good hand, causing her to fall down on her back; while she was hitting at him, he pulled her pants down to her knees. Garcia put his penis in her vagina, but stopped when he saw Dora's father driving down the road. Dora went home, but did not tell anyone what had happened until her birthday party. Dora also stated that Garcia had sexually assaulted her on another occasion in 2003 when Garcia's wife Norma was present. That time, Garcia had put his penis "on her rear."

Garcia was charged in two separate indictments with the aggravated sexual assault of Dora, a disabled person, in 2006 and 2003. *See* TEX. PENAL CODE ANN. § 22.021(a)(1)(A)(i),(a)(2)(C) (Vernon Supp. 2009). Before trial, Garcia filed a sworn motion for community supervision, and an election for the jury to assess his punishment, if necessary. The trial court consolidated the two cases for trial. At trial, Dora testified through a Spanish interpreter about the incidents of sexual assault by Garcia; a video interview of Dora was also admitted. Medical evidence from Dora's physical examination in January 2006 was presented showing that she had two bruises on her lower back and a bladder infection; her hymen was intact. Garcia's defense was based on credibility—he argued that Dora had a propensity to lie, and the sexual assaults did not happen. Garcia testified about the family dynamics and denied ever committing, or being accused of committing, any sexual assault. He

stated he has diminished sexual desire as a result of his medications. In addition, Garcia introduced a death certificate showing that his first wife Norma had passed away in 1997, before the alleged assault of Dora in 2003. During rebuttal, the State called Celinda Sepulveda Salinas, Dora's sister, who testified that Garcia sexually assaulted her years ago when she was an eight or nine-year old child, but she had been afraid to tell anyone.

After hearing the evidence, the jury acquitted Garcia of the aggravated sexual assault alleged to have occurred in 2003, but convicted him of the aggravated sexual assault that occurred on or about January 7, 2006. After the jury returned its verdict, Garcia moved for a continuance of the punishment phase so he could subpoena medical experts to testify before the jury. The court re-set the sentencing hearing. On the morning of the sentencing hearing, Garcia waived his right to have the jury assess punishment, and elected the trial court to assess his punishment. Garcia stated his waiver orally on the record and filed a written "Waiver of Jury for Sentencing" signed by him, his counsel, the prosecutor, and the trial court. The court discharged the jury, ordered a pre-sentence report prepared, and again reset the sentencing hearing. At the sentencing hearing before the trial court, the State presented several witnesses who provided victim impact evidence. Garcia presented expert testimony that he has suffered from post-traumatic stress disorder and depression for over ten years, and his treatment would be negatively affected by incarceration. At the conclusion of the hearing, the court imposed a sentence of 16 years' imprisonment in the Texas Department of Criminal Justice, Institutional Division. Garcia timely appealed.

### ANALYSIS

On appeal, Garcia claims that (1) his trial counsel rendered ineffective assistance during the guilt/innocence and punishment phases of trial, (2) his waiver of jury sentencing was involuntary

because it was based on misinformation provided by his counsel and the court, (3) the court erred in excluding evidence of the complainant's prior false accusations of sexual assault, and (4) the court erred in failing to replace an incompetent interpreter. Because we conclude that Garcia's attorney rendered ineffective assistance which requires reversal, we need not address Garcia's other appellate issues. TEX. R. APP. P. 47.1.

### INEFFECTIVE ASSISTANCE OF COUNSEL

In his first two issues on appeal,[1] Garcia asserts his trial counsel rendered ineffective assistance in violation of the state and federal constitutions based on several acts and omissions which include: (1) opening the door to the admission of a similar extraneous offense and other "bad acts" evidence during the guilt/innocence phase, thereby destroying Garcia's credibility and prejudicing his defense; (2) failing to object to hearsay improperly admitted as an "outcry" statement; (3) presenting a defense theory to the jury and then being forced to abandon it when the evidence did not support the theory; (4) failing to conduct a sufficient independent investigation of the facts of the case; and (5) erroneously advising Garcia that he could receive community supervision from the judge, thereby causing his post-conviction waiver of jury sentencing to render him ineligible for community supervision. The State replies that Garcia has failed to meet his burden of establishing ineffective assistance on this record. Garcia's attorney did not file a motion for new trial; therefore, no post-trial evidence was developed in support of his ineffective assistance of counsel claim and we must evaluate his claim on the basis of the trial record alone.

---

[1] Garcia alleges that his counsel rendered ineffective assistance under both the state and federal constitutions; however, because he presents no argument or authority that the Texas constitution provides different protection than the federal constitution, we will make no distinction between his federal and state claims. *Arnold v. State*, 873 S.W.2d 27, 33 (Tex. Crim. App. 1993); *Sturchio v. State*, 136 S.W.3d 21, 23 (Tex. App.—San Antonio 2002, no pet.).

The benchmark for evaluating a claim of ineffective assistance is whether counsel's conduct "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To establish ineffective assistance of counsel, a defendant must prove by a preponderance of the evidence that: (1) his trial counsel's performance was deficient; and (2) the deficient performance prejudiced his defense. *Garza v. State*, 213 S.W.3d 338, 347 (Tex. Crim. App. 2007) (citing *Strickland*, 466 U.S. at 687). To show deficient performance, the first prong of the *Strickland* standard, Garcia must prove that his counsel's performance fell below an objective standard of professional norms. *Garza*, 213 S.W.3d at 347-48. To establish prejudice, Garcia must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 348. We begin with a presumption that counsel acted within the wide range of reasonable professional assistance, and that his conduct was based on sound trial strategy. *Id.*; *Salinas v. State*, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005). To rebut the presumption that counsel's decisions were based on sound trial strategy, a defendant must show that his allegations of ineffectiveness are firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Salinas*, 163 S.W.3d at 740; *Thompson v. State*, 9 S.W.3d 808, 813-14 (Tex. Crim. App. 1999). If counsel's reasons for his conduct are not evident from the record, and there is a possibility his conduct was based on a legitimate trial strategy, then we must defer to counsel's decision-making and deny relief on an ineffective assistance claim raised on direct appeal. *Garza*, 213 S.W.3d at 348. We do not look at isolated acts or omissions to determine the effectiveness of counsel, but rather we review the totality of the representation. *Ex parte Nailor*, 149 S.W.3d 125, 130 (Tex. Crim. App. 2004); *Ex parte Welborn*, 785 S.W.2d 391, 393 (Tex. Crim. App. 1990).

*Guilt/Innocence Phase: Similar Extraneous Offense/Other "Bad Acts"*

As to errors committed by defense counsel during the guilt/innocence phase of trial, Garcia asserts, among other conduct, that his counsel rendered ineffective assistance by opening the door to a similar extraneous offense and other "bad acts" evidence on several occasions. Garcia also complains that his counsel did not file a Rule 404b request for notice of any extraneous offense evidence, did not object to admission of the extraneous evidence, and did not request a limiting instruction.

***The Record.*** The record contains several instances where defense counsel elicited testimony from Garcia and Garcia's wife on direct examination leaving a false impression and thus opening the door to otherwise inadmissible extraneous offense or "bad acts" evidence. During Garcia's testimony in his defense, counsel asked him whether he had "ever sexually assaulted anybody?" Garcia replied, "No, sir." Defense counsel then asked Garcia whether he had "ever been accused of sexually assaulting anybody?" and "ever been arrested for sexually assaulting anybody?" Garcia answered in the negative to both. On cross-examination, the prosecutor confirmed that Garcia knew Celinda Sepulveda Salinas, and then asked whether his denial of any prior sexual assaults was true. Garcia answered that he had known Celinda "since she was a little girl" and reiterated that he had never sexually assaulted anyone. Later that day, on rebuttal, the State called Celinda who testified that before Garcia went into the military he sexually assaulted her at his house when she was a child of about eight or nine years old; she had been afraid to tell anyone at the time, but told family members after Garcia was accused of assaulting her sister Dora.[2] Although defense

---

[2] The record shows Celinda informed the prosecutor about the prior sexual assault the day before when she testified during the State's case-in-chief. Defense counsel raised other objections to Celinda's rebuttal testimony, but did not object to a lack of notice.

counsel objected to this testimony on the grounds of remoteness, irrelevance, and undue prejudice, the trial court denied the objections, ruling that defense counsel had opened the door to the extraneous offense evidence on several occasions during trial by inquiring about prior sexual assaults as well as by offering evidence of the defendant's good character.[3] Garcia's counsel did not request a limiting instruction on the extraneous offense evidence, either at the time or later in the written jury charge.

In addition to the above testimony dealing with sexual assault, defense counsel also asked Garcia during his direct examination whether he had ever been arrested before, and Garcia replied he had been arrested for driving while intoxicated (DWI) more than ten years ago but that he had since stopped drinking. Defense counsel then brought up possession of handguns, asking Garcia, "Is that the time that you . . . had a handgun with you ?" Garcia answered, "Yes." Counsel then asked several more questions about handguns, inquiring whether Garcia had "handguns with you right now?" or had any handguns in his home. Garcia replied that he had turned all his guns in to the sheriff's department fifteen years ago. On cross-examination, the prosecutor questioned Garcia about a 1998 shooting in his home, within the preceding fifteen years, which Garcia conceded involved guns in his house and his son being shot in the house; there was no defense objection. Garcia also admitted on cross-examination that he had been arrested for DWI again in 2001 and 2003, even though he had previously testified that he had stopped drinking and had not been arrested

---

[3] In ruling that the extraneous offense evidence was admissible, the trial court explained, "You questioned the victim and your client extensively as to whether he had ever sexually abused the . . . alleged victim, as a child or anybody else." *See Wheeler v. State*, 67 S.W.3d 879, 885 (Tex. Crim. App. 2002) (when a witness presents a picture of the defendant as not the type of person to commit the charged offense, the State may present impeachment evidence concerning similar extraneous offenses); *see also Townsend v. State*, 776 S.W.2d 316, 318 (Tex. App.—Houston [1st Dist.] 1989, pet. ref'd) (testimony by defendant's psychiatrist that he did not fit the psychological profile of a sexual offender opened the door to State's rebuttal evidence that defendant had abused two witnesses several years earlier).

in the last ten years; there was no defense objection. In addition, Garcia admitted telling one of his doctors that he had been arrested for public intoxication "more or less" seven times. Finally, on cross-examination of Garcia's wife, the prosecutor elicited without objection that Garcia had been arrested one time during their marriage for "being intoxicated."

During closing argument, the prosecutor emphasized Celinda's testimony about the prior sexual assault and analogized sexual abuse of a child to sexual abuse of a disabled person. The prosecutor also stressed the evidence of Garcia's prior DWI and public intoxication arrests, as well as the shooting incident, to undermine Garcia's credibility and rebut the impression that he was a "law abiding" citizen.

***Discussion***. A defendant's "[d]irect-examination testimony containing a broad disclaimer of misconduct sometimes can open the door for extrinsic evidence to contradict even though the contradictory evidence is otherwise inadmissible under Rule 404 . . . ." *Daggett v. State*, 187 S.W.3d 444, 453 n.24 (Tex. Crim. App. 2005) (quoting *United States v. Antonakeas*, 255 F.3d 714, 724-25 (9th Cir. 2001)). "If a defendant testifies to a blanket statement of good conduct or character—*e.g.*, "I would never have sex with a minor"—he may "open the door" by leaving a false impression with the jury about a relevant act or character trait. Evidence of an extraneous act that tends to rebut such testimony may be admissible to impeach the defendant." *Id.* at 452; *see also Ramirez v. State*, 802 S.W.2d 674, 676 (Tex. Crim. App. 1990) (when witness leaves false impression concerning matter relating to his or her credibility, opposing party allowed to correct that false impression); *Prescott v. State,* 744 S.W.2d 128, 131 (Tex. Crim. App. 1988) (defendant who creates false impression during direct examination is commonly said to have "opened the door" to inquiry by the State as to the validity of his testimony).

Here, by eliciting testimony from Garcia on direct examination broadly disclaiming that he had ever sexually assaulted someone, defense counsel opened the door for the State to cross-examine Garcia, and to present rebuttal evidence of an extraneous offense of the same character as the charged aggravated sexual assault. *Daggett*, 187 S.W.3d at 453 n. 24. Similarly, by eliciting testimony that Garcia was a "law abiding" citizen, defense counsel opened the door for the State to cross-examine Garcia concerning other "bad acts" to correct any false impression created by his direct testimony and to impeach his credibility. *Wheeler*, 67 S.W.3d at 885; *Kincaid v. State*, 534 S.W.2d 340, 342 (Tex. Crim. App. 1976) (as a general rule, when a party introduces matters into evidence, he invites the other side to reply to that evidence).

Although not directly on point, we find it instructive that a defense counsel's repeated failure to object to the admission of multiple extraneous offenses or "bad acts" has been held to deprive a defendant of a fair trial and to constitute ineffective assistance. *See, e.g., Cude v. State*, 588 S.W.2d 895, 897-98 (Tex. Crim. App. 1979) (in armed robbery trial defense counsel's repeated failure to object to inadmissible extraneous offense evidence of the defendant's prior armed robberies, theft of a car, possession of drugs and a sawed-off shotgun, and prior incarceration was ineffective assistance and denied defendant a fair trial under pre-*Strickland* standard); *Doles v. State*, 786 S.W.2d 741, 746 (Tex. App.—Tyler 1989, no pet.) ("trial counsel's reoccurring failure to make proper objections to the deluge of evidence of extraneous sexual offenses committed by the appellant against his stepchildren, other than the victim, which were admitted during the guilt-innocence phase, represents professionally unreasonable errors, adversely affecting appellant's defense"); *Jackson v. State*, 857 S.W.2d 678, 683 (Tex. App.—Houston [14th Dist.] 1993, pet. ref'd) (counsel

rendered ineffective assistance by, among other conduct, permitting evidence of extraneous offenses of delivery of narcotics and possession of weapons to be admitted with no objection).

Here, Garcia's counsel repeatedly elicited or opened the door to evidence that set his client up for impeachment by the State and damaged Garcia's credibility with the jury. Given the inherently prejudicial nature of extraneous offense evidence, the fact that the evidence would not have been otherwise admissible by the State during guilt/innocence, and the fact that Garcia's defense rested almost entirely on his credibility, there could have been no reasonable trial strategy for Garcia's counsel to elicit and open the door to the similar extraneous offense and the numerous instances of "bad acts." *See Robertson v. State*, 187 S.W.3d 475, 484-86 (Tex. Crim. App. 2006) (holding that where defense depended on defendant's credibility, there was no possible reasonable strategy and defense counsel rendered deficient performance by intentionally eliciting and opening the door to otherwise inadmissible and clearly prejudicial evidence of defendant's current incarceration on two prior convictions, one of which involved similar conduct to the charged offense, during the guilt/innocence phase); *see also Ex parte Menchaca*, 854 S.W.2d 128, 132-33 (Tex. Crim. App. 1993) (holding that where defense turned on defendant's credibility there could be no strategic basis for allowing jury to hear defendant had prior conviction for same offense for which he was being tried and concluding counsel rendered ineffective assistance); *see also Williams v. State*, 662 S.W.2d 344, 346 (Tex. Crim. App. 1983) (recognizing "inherently prejudicial" nature of extraneous offense evidence). This is particularly true when, as here, the defense strategy was based almost entirely on the defendant's credibility versus the complainant's credibility. Opening the door to otherwise inadmissible extraneous offense evidence that undermines the defendant's character and credibility serves no purpose other than to prejudice the defendant's ability to present his defense.

*Robertson*, 187 S.W.3d at 484; *Menchaca*, 854 S.W.2d at 132-33; *Stone v. State*, 17 S.W.3d 348, 352-54 (Tex. App.—Corpus Christi 2000, pet ref'd) (holding trial record affirmatively showed defense counsel rendered ineffective assistance by purposefully eliciting testimony as to defendant's remote prior conviction for a different offense where there could be no possible reasonable strategy because defendant's credibility was crucial to his alibi defense). Accordingly, because Garcia's defense turned on the jury having a favorable opinion of his credibility, we conclude Garcia's counsel rendered deficient performance when he repeatedly elicited or opened the door to evidence that set his client up for impeachment by the State, including rebuttal evidence of a similar aggravated sexual assault.

**Guilt/Innocence Phase: Hearsay Improperly Admitted as "Outcry"**

Garcia also complains that Dora's aunt, Rebecca Sepulveda, was permitted to repeat what Dora told her about the sexual assault because Garcia's counsel was not familiar with the outcry statute and did not raise the proper objection. When the prosecutor asked Rebecca about the conversation she had with Dora about her recent withdrawn behavior, Garcia's counsel objected that it was "hearsay." When the prosecutor replied the testimony was being offered under the "outcry" statute as an exception to the general hearsay rule, defense counsel responded, "Judge, and that would be fine. The outcry is not seven days later or three years later, Judge." After a bench conference off the record, the court asked the State to repeat the question, and Rebecca testified about Dora's statements about the sexual assault with no further defense objection. Specifically, Rebecca testified Dora told her that when she went to water the plant at her relative's house, Garcia grabbed her from the back, threw her on the ground, pulled his clothes off, and "he do something with her."

The outcry statute in effect at the time of Garcia's trial only applied to hearsay statements by a child 12 years of age or younger that describe the alleged sexual offense and are made to the first person 18 years of age or older the child tells about the offense. *See* Act of Sept. 1, 1995, 74th Leg., R.S., ch. 76, § 14.25, 1995 Tex. Gen. Laws 834 (amended 2009) (current version at TEX. CODE CRIM. PROC. ANN. art. 38.072 (Vernon Supp. 2009)).[4] The outcry statute plainly did not apply to make admissible Rebecca's hearsay testimony about Dora's statements about the sexual assault. *See Martinez v. State*, 178 S.W.3d 806, 810 (Tex. Crim. App. 2005) (article 38.072, which allows for admission of outcry statements made by a child victim of abuse, deals with admissibility of evidence otherwise barred by the hearsay rule, while article 38.07, which allows a sexual offense conviction to be supported by uncorroborated testimony of the victim if an outcry was made within one year, deals with sufficiency of the evidence to support a conviction and does not act as a hearsay exception). In addition, contrary to defense counsel's references to time limits, the outcry statute contained no time restrictions within which the child's outcry must be made. It is clear from defense counsel's statements on the record that he was not sufficiently familiar with the outcry statute to (i) understand that Rebecca's testimony was not admissible on that basis, and to (ii) raise the proper objection to exclude the hearsay. Admission of Rebecca's testimony about Dora's statements was harmful to Garcia's defense because there was no other evidence to corroborate Dora's story about the sexual assault—the medical evidence was inconclusive, there were no eyewitnesses, and Garcia presented evidence that he took medications that diminished his sexual desire and performance; the

---

[4] Article 38.072 was amended by Act of June 11, 2009, 81st Leg., R.S., ch. 284, § 1, 2009 Tex. Sess. Law Serv. 743, which added provisions for "a person with a disability," which is defined as "a person 13 years of age or older who because of age or physical or mental disease, disability, or injury is substantially unable to protect the person's self from harm or to provide food, shelter or medical care for the person's self." Section 40 of the Act states that the changes made by the amendment apply only to a criminal proceeding that commences on or after June 11, 2009, the effective date of the Act.

State's case depended on Dora's credibility. Moreover, it is significant that the jury found Garcia not guilty on the second count of sexual assault on which no corroborating "outcry" statement was admitted, but convicted Garcia on the first count on which Rebecca's corroborating testimony was admitted. *See Martinez v. State*, 188 S.W.3d 291, 293 n.1 (Tex. App.—Waco 2006, pet. ref'd) (in assessing harm from erroneous admission of outcry statement, court found it significant that jury acquitted defendant on the counts where no outcry statement was admitted). The failure by Garcia's counsel to understand the law on outcry testimony, and to raise a proper objection to Rebecca's corroborating testimony, was deficient performance that prejudiced Garcia's defense.

***Guilt/Innocence Phase: Failure to Investigate the Facts/Abandoning a Defense Theory***

Counsel has a duty to conduct his own independent investigation into the facts of the case, and "should not blindly rely on the veracity either of his client's version of the facts or witness statements in the State's file." *McFarland v. State*, 928 S.W.2d 482, 501 (Tex. Crim. App. 1996) (citing *Ex parte Duffy*, 607 S.W.2d 507, 516 (Tex. Crim. App. 1980)), *overruled on other grounds*, *Mosley v. State*, 983 S.W.2d 249, 264 n.18 (Tex. Crim. App. 1998); *Cantu v. State*, 993 S.W.2d 712, 718 (Tex. App.—San Antonio 1999, pet. ref'd) (duty to investigate includes seeking out and interviewing potential witnesses). Counsel's duty to investigate the facts is not absolute, but includes an obligation to make a reasonable decision that a particular investigation is unnecessary. *Strickland*, 466 U.S. at 690-91; *McFarland*, 928 S.W.2d at 501; *Cantu*, 993 S.W.2d at 718. Here, Garcia's counsel admitted on the record that he did not interview the complainant or other State's witnesses before trial. At the beginning of his cross-examination of Dora and several of the State's witnesses, Garcia's counsel stated on the record whether or not he knew the witness outside of court and confirmed that he had not talked to them about the case. For example, when counsel began his

cross-examination of Dora, he confirmed that, "[y]ou and I have never had a conversation of what happened in the year 2003 or 2006 ?" Before he cross-examined Velma Sepulveda Fleming, counsel stated, "Ms. Fleming, we know each other . . . but we never talked about this case at all. This is the first time you and I talk about this case?" and she answered, "Yes, sir." Defense counsel began his cross-examination of Celinda Sepulveda Salinas, the witness who testified to a prior sexual assault by Garcia, by confirming that they knew each other outside of court, and then stating, "But we never talked about this case before?" She answered, "No, sir."

Due to this lack of investigation, counsel was unaware that his original defense theory presented during opening statement, that Dora was a trouble-maker and had been banned from the homes of Garcia and several other relatives in the neighborhood, would not be supported by the witnesses' trial testimony. Thus, even though counsel stressed the "family history" defense theory to the jury during opening, he was forced to abandon it during trial when the witnesses' testimony did not support his thesis that Dora was forbidden from visiting their homes. In fact, none of the witnesses supported the theory that Dora was not welcome on their property or in their homes. In closing argument, the prosecutor attacked Garcia's credibility by reminding the jury that the evidence had not borne out the defense theory that Dora was a "trouble-maker" and an unwelcome visitor within the family.

Finally, the record reflects that Garcia's counsel was aware of prior allegations of sexual assault made by Dora against other men which had been dismissed; however, counsel was unable to locate the supporting documents from the clerk's office during a trial recess and thus failed to present such evidence to the jury. Counsel's failure to interview the witnesses before trial evidences his lack of investigation and preparation in formulating and presenting a defense on behalf of Garcia.

Counsel's inadequate investigation and preparation led to the abandonment of the initial defense theory when examination of the witnesses failed to support the theory; further, it contributed to counsel's questioning of witnesses in a manner that opened the door for "bad acts" evidence and impeachment of Garcia's credibility—upon which his only viable defense rested. Defense counsel's performance in this regard was deficient.

***Punishment Phase: Erroneous Advice About Availability of Community Supervision***

Finally, Garcia asserts his counsel rendered ineffective assistance by incorrectly advising him that the trial judge could award him community supervision if he waived a jury during the punishment phase, which caused him to lose his opportunity for community supervision. The State responds that any misstatement of the law was corrected in the pre-sentence report, and Garcia waived any error by not requesting reinstatement of his right to a jury at that time; it also asserts the record does not show whether Garcia's decision to waive jury sentencing was based on his attorney's misinformation.

***The Record***. At the initial setting for the sentencing hearing, Garcia's attorney stated on the record, "we are waiving the Jury . . . this morning after discussing it with Mr. Garcia, Judge, at length and so forth, discussing it with his family and . . . in the courtroom also. They have elected to waive the Jury this morning and for the Court to assess punishment in this case." Counsel continued explaining what he had advised Garcia, stating,

> I have advised him that **the Court can do what a Jury does**; hear evidence in this case, hear whatever witnesses we need to present . . . That **the Court** will pass punishment in this case **according to the application** we filed. **If he meets all the requirements, five years probation to ten years probation** and $10,000 fine. **I've explained that the Court can also not give him probation** and sentence him from five years to ninety-nine or life in this case plus a $10,000 fine. It's a first degree

felony. And with all those admonishments, Judge, that I gave him, he still insists that he wants to waive the Jury and go to punishment before the Court.

(emphasis added). At that time, the trial court swore in Garcia and questioned him about whether his decision to waive the jury was made knowingly and voluntarily. The trial court and Garcia had the following exchange:

THE DEFENDANT: I don't want no Jury [sic].

THE COURT: You don't want a Jury, is that what you're telling me?

THE DEFENDANT: Yes.

THE COURT: Do you understand, sir, that I'll sentence you **under the same laws that the Jury would sentence you.** Do you understand that ? (emphasis added).

THE DEFENDANT: Yes, sir.

THE COURT: In other words, I can sentence you for anywhere between five to ninety-nine years in the penitentiary or life. Do you understand that ?

THE DEFENDANT: Yes.

THE COURT: I also understand that you have filed **an application for probation in this case, and that's something that the Court can consider**, but I don't have to consider that. Do you understand that? (emphasis added).

THE DEFENDANT: Yes, sir.

THE COURT: Do you still want me to assess your punishment, the Court ?

THE DEFENDANT: Yes, sir.

Garcia then signed a written waiver of his right to a jury, again confirming to the court that he was doing so knowingly and voluntarily. The court approved the jury waiver and discharged the waiting jury. The sentencing hearing was reset so that a pre-sentence report could be prepared.

At the sentencing hearing, the State and Garcia presented their punishment witnesses and then rested. The court then asked whether there were any objections to the pre-sentence report. Garcia's counsel objected that the report was incomplete with respect to the consequences for sexual offenders. In response, the court asked defense counsel whether he had seen the report's references to section 22.021 of the Penal Code and article 42.12 of the Code of Criminal Procedure,[5] and whether he had any issues regarding the application of those laws to the sentencing in Garcia's case. Counsel replied, "No . . . that's what the Court needs to apply, Judge." The written pre-sentence report, which is included in the clerk's record, states in Section V that, "Under Article 42.12 . . . section 3(g) . . . a defendant adjudged guilty of . . . aggravated sexual assault . . . shall not qualify for Judge ordered community supervision." However, there is no discussion on the record in front of Garcia about the pre-sentence report's statement that the trial judge could not grant community supervision in Garcia's case, and there is no explanation or admonishment to Garcia telling him that the court had no authority to grant him community supervision. Even after the trial court directed defense counsel's attention to article 42.12, there is nothing in the record to show counsel talked to Garcia and corrected his prior erroneous advice about the availability of court-ordered community supervision.

---

[5] Article 42.12 of the Code of Criminal Procedure contains twenty-four sections addressing all aspects of community supervision from eligibility to revocation. TEX. CODE CRIM. PROC. ANN. art. 42.12 (Vernon 2006 & Supp. 2009). Section 3g of article 42.12 prohibits a trial judge from granting community supervision to a defendant convicted of certain designated offenses, including aggravated sexual assault. TEX. CODE CRIM. PROC. ANN. art. 42.12 § 3g(a)(1)(E) (Vernon Supp. 2009).

***Discussion***.  An attorney has a duty to exert his best efforts to ensure that his client's decisions are based on correct information as to the applicable law. *Ex parte Wilson*, 724 S.W.2d 72, 74 (Tex. Crim. App. 1987).  "An attorney's failure to give competent advice to a defendant which would promote an understanding of the law in relation to the facts and which would permit an informed and conscious choice is error." *Gallegos v. State*, 756 S.W.2d 45, 48 (Tex. App.—San Antonio 1988, pet. ref'd) (citing *Ex parte Morse*, 591 S.W.2d 904, 905 (Tex. Crim. App. 1980)).  Counsel's erroneous advice to Garcia that community supervision was still available if he chose to go to the judge for sentencing fell below an objective standard of reasonably professional judgment and foreclosed him from receiving community supervision.  *See Gallegos*, 756 S.W.2d at 48 (counsel who failed to inform defendant his jury waiver at punishment phase precluded him from receiving probation was ineffective, where the error was not an exercise of reasonable professional judgment and prejudiced defendant); *see also Ex parte Canedo*, 818 S.W.2d 814, 815 (Tex. Crim. App. 1991) (counsel's erroneous advice to defendant to elect court to assess punishment was based on counsel's mistaken belief that defendant was eligible for shock probation and deprived defendant of opportunity for jury to assess probation, and thus fell below standard of reasonable representation); *Ex parte Battle*, 817 S.W.2d 81, 83 (Tex. Crim. App. 1991) (defendant's election to plead guilty, based on counsel's erroneous advice that he was eligible for court-ordered probation, was not done voluntarily and knowingly); *Medeiros v. State*, 733 S.W.2d 605, 607 (Tex. App.—San Antonio 1987, no pet.) (attorney's admitted lack of knowledge of probation laws cannot supply basis for informed decision concerning assessment of punishment).

To prevail on an ineffective assistance claim based on defense counsel's misunderstanding of the law regarding community supervision, however, "more must be apparent from the record than

trial counsel's mere mistake." *State v. Recer*, 815 S.W.2d 730, 731 (Tex. Crim. App. 1991). Garcia must show that: (1) he was otherwise eligible to receive community supervision; (2) counsel's advice to elect the judge for sentencing was not part of a valid trial strategy; (3) his decision to go to the judge for punishment was based on counsel's erroneous advice; and (4) his decision would have been different if counsel had correctly informed him of the law regarding community supervision. *Id.*; *Isham v. State*, 258 S.W.3d 244, 252 (Tex. App.—Eastland 2008, pet. ref'd).

Here, the record in this case clearly shows that Garcia was eligible for community supervision and that his attorney erroneously advised Garcia it was possible for him to receive community supervision from the judge if he waived his right to a jury for punishment; moreover, this misinformation was given to him *after* he was convicted of the § 3g offense of aggravated sexual assault and *before* his jury waiver.[6] It is plainly evident that Garcia's attorney provided Garcia with inaccurate information about the availability of community supervision from the court for a § 3g offense, which can never constitute a legitimate or reasonable strategic decision. *Canedo*, 818 S.W.2d at 815; *Gallegos*, 756 S.W.2d at 48. Further, as to the second and fourth *Recer* elements, Garcia's consistent desire to receive community supervision is affirmatively shown by the record, both before and after his jury waiver. The record shows that Garcia was actively seeking community supervision and was eligible to receive it, having timely filed a sworn written application for community supervision and presented evidence of his lack of prior felony convictions through his wife's testimony at trial. *Cf., Pivral v. State*, No. 04-08-00489-CR, 2009 WL 2045309, at *3 (Tex.

---

[6] This is not a case where the defendant elected the court to assess punishment when there was still a possibility he could be convicted of a lesser offense for which the trial judge could grant community supervision. *See, e.g., Saucedo v. State*, 756 S.W.2d 388, 392-94 (Tex. App.—San Antonio 1988, no pet.); *Isham v. State*, 258 S.W.3d 244, 252-53 (Tex. App.—Eastland 2008, pet. ref'd).

App.—San Antonio July 15, 2009, no pet.) (not designated for publication) (holding that even if counsel's performance in advising defendant to elect punishment by the court was deficient, he failed to show prejudice because he had not filed a sworn motion for community supervision). Further, as evidenced by the record, Garcia's attorney specifically mentioned court-ordered probation as a sentencing option when he was advising Garcia about the decision to waive a jury; this shows the availability of community supervision from the court was part of Garcia's discussions with counsel and was considered by Garcia in making the decision to waive the jury. Further, even after his jury waiver, Garcia continued to seek community supervision by presenting punishment testimony in support of his application for community supervision. Garcia's treating psychiatrist testified that Garcia requires consistent in-office treatment and monitoring of his medications for post-traumatic stress disorder, he has previously attempted suicide, and incarceration would impede his treatment.

There is absolutely nothing in the record to indicate that by waiving a jury for sentencing Garcia intended to abandon his application for community supervision or understood that was an inevitable consequence of his jury waiver; to the contrary, the record shows that after his wavier Garcia continued to seek a punishment option that did not involve incarceration, *i.e.*, community supervision. This is not a case where counsel made a strategic reason to waive the jury after conviction in order to limit the defendant's punishment exposure by going to the judge for punishment. In addition, the trial court's misstatement that it could consider Garcia's application for community supervision compounded the prejudicial effect of counsel's erroneous advice on the

matter.[7]  Moreover, the affirmative misstatements by counsel and the court concerning the availability of court-ordered community supervision were never corrected on the record.  As to the pre-sentence report, it was prepared well after Garcia entered his jury waiver.  Further, the specific statement in the pre-sentence report that community supervision was not available from the court for an aggravated sexual assault was never brought to Garcia's attention during the sentencing hearing;[8] even if the statement had been pointed out and Garcia had tried to withdraw his jury waiver, as the State suggests he should have, the jury had already been discharged.  Moreover, the statement in one section of the report that community supervision was not available was simply not enough to correct the affirmative misstatements by the trial court as well as Garcia's counsel to the contrary—at most, it presented opposing or conflicting information to Garcia about his ability to receive community supervision from the court.

In this unique case where the trial record affirmatively shows that (i) Garcia was eligible and applied for community supervision from a jury, (ii) initially elected to be punished by a jury, (iii) was erroneously advised by his attorney, as well as by the trial court, that he could possibly receive community supervision from the court if he waived a jury after his conviction for aggravated sexual assault, (iv) waived the jury for punishment after the erroneous advice, and (v) presented expert testimony in support of his application for community supervision during the punishment hearing,

---

[7] While we do not separately address Garcia's complaint on appeal based on the trial court's erroneous statements concerning the availability of court-ordered community supervision, we consider the court's statements as part of the record as a whole.

[8] When asked by the trial court whether he had seen the pre-sentence report, Garcia did not give an affirmative answer, merely saying, "Sir?"  The court then asked Garcia whether he had discussed the pre-sentence report with his attorney, to which Garcia replied, "Yes, sir."  When the court questioned Garcia about whether he told the probation officer he did not commit the sexual assault of which he was convicted, Garcia replied, "I didn't understand the paper."

we conclude Garcia has met his burden of proving the *Recer* elements and has established ineffective assistance of counsel.

***Totality of Counsel's Representation Prejudiced Garcia's Defense***

Having concluded, *supra*, that the conduct of Garcia's counsel during both the guilt/innocence and punishment phases fell below an objective standard of reasonable professional assistance, we must now determine whether counsel's performance, in its totality, prejudiced Garcia's defense and deprived him of a fair trial such that it requires reversal. *See Nailor*, 149 S.W.3d at 130. In making that determination, we evaluate the quality of counsel's representation in its totality from counsel's perspective at the time of trial, rather than focusing on isolated acts or omissions with the benefit of hindsight. *Strickland*, 466 U.S. at 689; *McFarland v. State*, 845 S.W.2d 824, 843 (Tex. Crim. App. 1992). This record affirmatively demonstrates a pattern by Garcia's counsel of misunderstanding the applicable law, which can never be a legitimate trial strategy. *See Garza*, 213 S.W.3d at 348 (reviewing court on direct appeal must defer to counsel's decision-making unless ineffective assistance is firmly founded in the record and there is no possible legitimate strategy underlying the decisions); *see also Salinas*, 163 S.W.3d at 740. The record further shows that counsel's deficient conduct permeated both phases of trial, and deprived Garcia of a fair trial and reliable result. *Strickland*, 466 U.S. at 687. Counsel's conduct in introducing and opening the door to a prior sexual assault and other "bad acts" evidence, along with his failure to object or request a limiting instruction, shows his lack of investigation of the relevant law and facts in advance of trial. Such conduct led to the admission of evidence that undermined Garcia's character and credibility, thereby prejudicing his ability to present his only viable defense which was

dependent on the strength of his own credibility as compared to that of Dora.[9] *See Robertson*, 187 S.W.3d at 484; *Menchaca*, 854 S.W.2d at 132-33; *Stone*, 17 S.W.3d at 352-54. In addition, defense counsel's failure to understand the law on admissibility of "outcry" statements led to his failure to raise a proper objection which led to the admission of harmful hearsay that corroborated Dora's testimony, again prejudicing Garcia's credibility-based defense. Viewing this conduct along with counsel's admitted failure to interview witnesses before trial and to fully investigate Dora's prior sexual assault allegations, a clear pattern of uninformed and unprepared representation by Garcia's counsel emerges from this record. Finally, counsel's obvious failure to understand the law on community supervision, and his erroneous advice that court-ordered community supervision was available to Garcia after his conviction for a § 3g offense, wholly deprived Garcia of any opportunity to receive community supervision and thus prejudiced him with respect to punishment. *See Canedo*, 818 S.W.2d at 815; *Recer*, 815 S.W.2d at 731; *Gallegos*, 756 S.W.2d at 48.

As we said several years ago in *Green v. State*,

> 'Ineffectiveness of counsel' is not a specter. It can exist. It's just hard to prove reversible error. It can be shown when the trial counsel's errors are so fundamental with such far-reaching implications that no one could excuse them as 'trial strategy' because no reasonable lawyer would do them. The cumulative effect of enough of these errors can simply undermine the concept of a fair trial . . . .

*Green v. State*, 899 S.W.2d 245, 247-48 (Tex. App.—San Antonio 1995, no pet.). We conclude that this is just such a case. In its totality, counsel's representation deprived Garcia of the "counsel" guaranteed by the Sixth Amendment, and deprived him of a fundamentally fair trial whose result is

---

[9] The jury's acquittal of Garcia on the 2003 offense must be viewed in light of the admission of uncontroverted proof through a death certificate that Garcia's first wife, Norma, died several years before Dora said she was present at the alleged 2003 assault.

reliable. *Strickland*, 466 U.S. at 687; *Nailor*, 149 S.W.3d at 130. Accordingly, the trial court's judgment is reversed and the cause is remanded for a new trial.

Phylis J. Speedlin, Justice

PUBLISH